UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRAD REED, INDIVIDUALLY AND AS JOINT LIMITED CONSERVATORS OF I.R., A MINOR; AND TARA REED, INDIVIDUALLY AND AS JOINT LIMITED CONSERVATORS OF I.R., A MINOR; | 5:17-CV-05047-JLV |
| Plaintiffs, | REPORT AND RECOMMENDATION |
| vs. | |
| UNION RESORT, LLC, dba MYSTIC MINER, | |
| Defendant. | |

**INTRODUCTION**

This matter is before the court on the amended complaint of Brad and Tara Reed as conservators of I.R., their minor daughter.  See Docket No. 16. The Reeds allege claims of negligence and gross negligence against defendant Union Resort, LLC, dba Mystic Miner (defendant) arising out of a tubing accident at defendant's ski resort.  Id.  This matter rests on the court's diversity jurisdiction, 28 U.S.C. § 1332.

Defendant has now filed a motion for summary judgment.  See Docket No. 21.  The Reeds oppose the motion.  See Docket No. 30  The motion was referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B), the order of referral dated November 11, 2018 (Doc. 42),

and the October 16, 2014, standing order of the Honorable Jeffrey L. Viken, Chief United States District Judge.

## FACTS

Defendant filed a statement of undisputed material facts, Docket No. 22, to which the Reeds have responded, Docket No. 31. The following facts have been drawn from those pleadings with disputes or discrepancies as noted.

On March 13, 2015, Brad and Tara Reed brought their children to the defendant's resort near Lead, South Dakota, for an afternoon of recreational snow tubing.[1] The resort was owned and operated by Union Resort, LLC, dba Mystic Miner. Among the Reeds' children with them that day was seven-year-old I.R. Accompanying the Reeds were another couple and Alex, a social worker from the Philippines.

Upon arriving shortly before noon, the Reed party entered the lodge area where customers are required to check in and purchase admission tickets for the resort. The Reeds purchased snow tubing day passes for themselves and their children, including I.R. As a condition of allowing I.R. to use the resort, Union required the Reeds to agree to a written release of liability. The Reeds signed the release and printed the names of each of their children, including I.R., as participants.

---

[1] Defendant repeatedly refers to its resort as "Deer Mountain," a former name by which the resort was known. Because "Deer Mountain" is neither the official name of the business entity which owns the resort, nor its official "dba," in order to avoid confusion the court refrains from using the name "Deer Mountain" and instead simply refers to the defendant as "defendant" and its resort as "resort."

The Reeds understood the document was a release of liability agreement and that, by signing, they would be relinquishing certain unspecified rights. They did not ask any questions about the release.  The release informed resort participants that tubing activities are extremely hazardous and can result in personal injury.  The Reeds understood that tubing carried with it a degree of risk, including risk of trauma to the head, and that I.R. would be exposed to this risk.

After signing the release and paying the admission fee, the Reeds and their kids received individual tickets for the tube park.  Those tickets included additional warnings.

At the resort, there are numerous bright red signs that provide instructions and warnings to participants.  Among the messages on some of the signs was a warning that collisions with other tubers was one of the dangers of tubing.  Other signs instructed the tubers to follow the attendant's instructions and to wait for the attendant's signal before starting [down the tube run].  The Reeds do not recall whether they saw or read any of these signs.

The Reeds were directed to select tubes from the resort's selection of tubes, which they did.  Defendant had approximately 50 to 70 tubes in inventory at the time, but there is no evidence how many of these tubes had already been selected by prior guests.  No employee of defendant selected the tubes for the Reeds.  Several defendant employees testified at their depositions that it was a practice at the resort to leave tubes with tears in the bottoms in

3

circulation for guests to use.  The employees explained that such tubes were slower and slower equated to safer in their minds.

During the Reeds' stay at the resort, they went down the tube runs approximately 15 to 20 times.  Two of the four tube runs at the resort were open that day.  During the Reeds' runs, there were two defendant employees at the bottom of the tube runs assisting guests with the tow rope (which towed guests to the top of the run).

On approximately two of the Reeds' 15-20 tubing runs, there was a young man at the top of the tube runs who also appeared to be a resort employee with a radio in his possession.  However, the young man never monitored the tube runs, never gave instructions to tubers, and never staged tubers going down the tube runs.  "Staging" means controlling the entry of guests onto the tube runs to ensure that the prior tuber has finished the run and cleared the area before the next tuber is allowed to begin his or her descent.  There was no staging and, instead, tubers decided themselves when to begin their descent, a situation Brad Reed described as a "free-for-all."

At approximately 2 p.m., the Reeds decided to take one last run down the tube runs before leaving the resort.  Up to this point, the Reeds had experienced no concerns or incidents.  Up to this final run, I.R. had always completed her run down the slope as part of a group or with one of her parents.  On the final run, she asked to be allowed to go down the tube run by herself, to which her parents agreed.  Mrs. Reed told I.R. they would go down the run together, parallel to each other in each of the two open tube runs.  At

this point, Alex was directly behind I.R. in line for the same tube lane. Mr. Reed was behind Alex in the same line.

Once both lanes were clear, Mrs. Reed and I.R. began their descents. Mrs. Reed went all the way down the run, but I.R.'s tube stopped approximately ¾ of the way down the slope. While I.R. was stopped, Alex began her descent before I.R. cleared the lane. When Alex's tube reached I.R.'s tube, they collided. No defendant employee told Alex to begin her descent, but no defendant employee was present at the top of the run to tell her, instruct her, or prevent her from beginning her descent until I.R. cleared the lane.

From the top of the slope, Mr. Reed testified Alex should have been able to see I.R. had not cleared the lane had Alex been paying attention. See Docket No. 25-5 at p. 7 (depo. pp. 25-26). Mr. Reed himself was able to observe the collision from his vantage point at the top of the slope. Id. at p. 6 (depo. pp. 22-24).[2]

After the accident, the Reeds observed an approximately 8-inch hole in the bottom of I.R.'s tube that had filled with snow. Defendant asserts it was its policy to stow the tubes under the deck each night and to pull them out the next day for guests' use. Defendant asserts employees were directed to observe the tubes for significant tears or defects and to remove defective tubes during this process. However, several defendant employees testified they left tubes with tears in their bottoms in rotation for guest use because the tears would

---

[2] The Reeds object to this statement of fact as "speculative." However, the court relies on the deposition of Brad Reed, one of the plaintiffs herein, for support for the assertion of fact.

slow the tuber down as they descended the slope. Employees believed a slower descent was a safer descent.

If a lightweight child descended the slope with a tube with a tear in it, sometimes the tube would stop mid-way down the slope and a defendant employee would have to walk up the slope to retrieve the child. In such an instance, the defendant employee at the bottom of the slope would radio the employee at the top and tell them to stop sending guests down the slope until the child was retrieved and taken to the bottom.

No photograph was taken of I.R.'s tube at the beginning of the day, after the accident, or at any other time on the day of the accident. It is unknown if the tear in the bottom of her tube was there from the start of the day or whether the tear occurred during the Reeds' use of the tube that day. The Reeds mixed and mingled the various tubes they checked out, so several members of the Reeds' group could have used the accident tube at various times of the day.

The accident tube was the only tube checked out by the Reed group that had a tear in it. The Reeds did not notice the tear until after I.R.'s injury. The Reeds did not inform anyone at the resort about the tear in the tube after the accident occurred. There is no evidence that any defendant employee had specific knowledge that the Reeds had checked out a tube with a tear in it on the day of the accident, though defendant employees had general knowledge that such tubes were often retained in inventory because they were perceived to be "safer" because they were slower.

From the beginning of the 2010-11 season through the end of the 2014-15 season, defendant had incident reports of 17 collisions of tubers. During that same time frame, there were 72 total incident reports.[3] Several of these collisions between tubers occurred within a few weeks and, in two examples, a few days, of I.R.'s collision. Specifically, there were 5 incident reports involving collisions between tubers going down the tube lane between December 30, 2014, and February 27, 2015. None of defendant's incident reports record whether a hole in a tube contributed to the incident.

Defendant maintains that it had a proper protocol of having at least one employee at the top of the tube run and one employee at the bottom of the tube run at all times. The employee at the top of the tube run was supposed to "stage" the tubers going down. The employee at the bottom of the tube run would retrieve items lost by tubers going down the slope (hats, mittens, etc.) and also retrieve guests whose tubes stopped without fully descending the slope.

The Reeds assert defendant was chronically understaffed and that defendant made a deliberate decision not to station an employee at the top of the tube run the day of I.R.'s accident. Defendant asserts the Reeds have no evidence to support the assertion that the decision not to station an employee at the top of the tube run was a deliberate decision.

---

[3] The court notes neither party clarifies what the scope of the incident reports were. Did they include encounters with wild animals? Strokes and heart attacks? Skiing accidents as well as tubing accidents? Drunken brawls between guests? Thus, little can be inferred from the ratio of 17 collisions with 72 undefined other "incidents."

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

**B.     Does the Release Signed by the Reeds Bar Their Claims?**

Defendant's first argument in favor of its summary judgment motion is that the clear and plain language of the release signed by the Reeds bars their claims and that there is no overriding public policy that serves to neutralize the release.

9

South Dakota law[4] provides that a valid release of liability bars claims for ordinary negligence, but does not bar claims for gross or willful negligence or recklessness.  Holzer v. Dakota Speedway, Inc., 610 N.W.2d 787, 792-93 (S.D. 2000).  The Reeds do not argue that the release was invalid in any way or that the activity I.R. was engaged in when she was injured was outside the scope of the release.  In fact, the Reeds concede that their first claim in their amended complaint for ordinary negligence is barred by defendant's release.  See Docket No. 30 at p. 5.  Accordingly, the court recommends that defendant's motion for summary judgment as to the Reeds' claim for ordinary negligence, count one of the amended complaint, be granted.

## C.    Are There Material Factual Disputes as to Gross Negligence?

Defendant argues the facts alleged by the Reeds, even if true, allege a claim for ordinary negligence only, not gross negligence.  Thus, since ordinary negligence is barred by the release, defendant argues it should be granted summary judgment on the Reeds' gross negligence claim too.

Under South Dakota law, the phrase "gross negligence" is synonymous with the phrase "willful and wanton misconduct."  Fischer v. City of Sioux Falls, ___ N.W.2d ___, 2018 WL 4779267 at *2 (S.D. Oct. 3, 2018).  Both phrases refer "to a category of tort that is different in kind and characteristics than negligence."  Id.  Negligence occurs when one acts with an "unreasonable

---

[4] In this case which rests on the court's diversity jurisdiction, the substantive law of the state in which the matter is plead applies.  Erie R. Co. v. Tompkins, 304 U.S. 64 (1938).  Here, that law is the state law of South Dakota.  Federal procedural rules, however, apply.  Hanna v. Plumer, 380 U.S. 460 (1965).

risk of harm to another." Id. (citing W. Page Keeton et al., Prosser & Keeton on the Law of Torts, § 34, at 212 (5th ed. 1984)).  Willful and wanton misconduct requires a risk of harm that is "substantially greater than that which is necessary to make the conduct negligent." Id.  The threatened harm "must be an easily perceptible danger of death or substantial physical harm." Id. (all quotes from Fischer cleaned up).

In addition, proof of a negligence claim focuses on the ordinary standard of care, while a gross negligence claim focuses on the defendant's mental state. Id. at *3.  A defendant acts willfully and wantonly when it knows or has reason to know at the time of its actions of the dire risk and proceeds without concern for the safety of others.  Id.  The standard does *not* require proof of intent to harm, but it does "partake to some appreciable extent ... of the nature of a deliberate and intentional wrong." Id.  Gross negligence requires "an affirmatively *reckless* state of mind." Id.  There must be "a conscious realization that a serious physical injury was a *probable*, as distinguished from a *possible* (ordinary negligence), result of such conduct." Id. (all quotes from Fischer cleaned up).

The evidence must show more than "mere mistake, inadvertence, or inattention . . . there need not be an affirmative wish to injure another, but, instead, a willingness to injure another." Gabriel v. Bauman, 847 N.W.2d 537, 541 (S.D. 2014)).  Generally, whether the facts constitute gross negligence is a question of fact "if reasonable minds might differ in interpreting the facts in arriving at different conclusions on whether the defendant was willful, wanton,

11

or reckless." Id. at 542. "Because willfulness, wantonness, or recklessness is almost never admitted, and can be proved only by the conduct and the circumstances, an objective standard must of necessity in practice be applied. Id. at 542-43.

Summarizing the above case law, gross negligence is distinguished from ordinary negligence by two factors. The risk of harm must be greater for gross negligence—whereas under ordinary negligence, the risk of harm can be anything from negligible harm to death, the risk of harm for gross negligence must be death or serious harm. Fischer, 2018 WL 4779267 at *2. Secondly, the likelihood that harm will come about, phrased in terms of the defendant's state of mind, must be greater. For example, if there is a 10 percent chance some harm will happen and the defendant fails to take steps to ensure that harm does not come about, he is merely negligent. If there is an 85 percent chance serious harm or death will happen and the defendant fails to take steps to ensure the harm does not occur, he has acted willfully and wantonly or with gross negligence.

The Reeds posit three facts in support of their assertion the defendant in this case acted grossly negligent (or willfully and wantonly) with regard to I.R. First, the defendant had a practice of leaving tubes with tears in the canvas bottoms in rotation for guests to use because the torn tubes were slower and, therefore, in the eyes of defendant's employees, safer. Second, the defendant knew the importance of staging—having an employee at the top of the tube run to meter the guests as they descended the slope so that one guest could clear

12

the run before the next guest began descending—but made a deliberate decision not to station an employee at the top of the tube run on the day of I.R.'s accident. And, finally, the existence of prior collisions on the tube run put the defendant on notice of the likelihood of harm.

Neither party speaks to the magnitude of the harm which, as discussed above, is one of the two factors distinguishing ordinary negligence from gross negligence. The defendant does not cite facts or circumstances to show that the prior collisions were minor bump-and-bruise types of encounters. The Reeds do not cite facts or circumstances to show the prior collisions resulted in concussions, closed head injuries, broken bones, surgeries or hospitalizations. The Reeds have supported their assertion that I.R.'s injuries were sufficiently serious—a fractured skull--something defendant does not dispute. Because the moving party has the burden, the court makes all inferences in favor of the nonmoving party. Accordingly, the court infers that previous accidents were sufficiently severe in nature to satisfy the standard required for gross negligence.

Likewise, with regard to the number of prior incidents, neither party has placed into the record what the total number of tubers was during the period of time covered by the incidents. This fact goes to the likelihood of a collision—for gross negligence, there must be a greater probability of harm occurring than is the case with ordinary negligence. If 17 collisions occurred between fall of 2010 and March 15, 2015, and there were 5,000 tubers during that time, the number of prior accidents takes on one type of significance. But the

significance of the number of prior accidents is different if the total number of tubers during that time frame is 100, 300, or even 500.  There is a significantly bigger risk of harm the smaller the total number of tubers.  Although the defendant alleges there were "thousands" of tubers, it has not supported that assertion with citation to an affidavit, deposition, or authenticated document. Again, there is a lack of evidence.

Also, neither party describes the scope of defendant's incident reports. Do they encompass all kinds of incidents—those attributable to conditions on the slopes within defendant's control as well as incidents attributable to factors not within defendant's control?  Do they encompass heart attacks and strokes as well as collisions?  Do the reports include drunken brawls between guests as well as injuries inflicted when a tow bar snaps?

Furthermore, is there any evidence suggesting that not all collisions at defendant's resort are documented in incident reports?  Are the incident reports the tip of the iceberg—or are they truly representative of all injuries occurring at defendant's resort?

Finally, defendant does not dispute that no employee was stationed at the top of the tube run at the time of I.R.'s accident.  The Reeds assert that defendant was "chronically understaffed" and that defendant made a "deliberate decision" not to place an employee at the top of the tube run that day.  The Reeds have amply supported their assertion that defendant was chronically understaffed, with the result that positions that should have been filled by employees were left unattended.  See Docket Nos. 33-4, 33-5, & 33-8.

14

The Reeds also supplied testimony that, when there were not enough employees, the defendant prioritized putting an employee at the bottom of the tube slope rather than at the top of the slope.  See Docket No. 33-4 at p. 5 (depo p. 20).  From these two facts, the Reeds infer that defendant made a "deliberate decision" the day of the accident not to place an employee at the top of the tube slope to stage the tubers.

Defendant disputes that it made a "deliberate decision" not to have an employee staging the tubers that day.  Defendant's disagreement with the Reeds' assertion is based solely on the fact that they do not have testimony from any witness stating outright that a calculated decision was made.  Defendant seems to assert that the Reeds may not rely upon an inference, but must have affirmative evidence of the fact a "deliberate decision" was made.

The court makes two observations.  Under the law of gross negligence, South Dakota has recognized a plaintiff will rarely have direct evidence of the defendant's state of mind.  Gabriel, 847 N.W.2d at 542-43.  Rather, state of mind must be inferred from the circumstances.  Id.  Also, under the law of summary judgment, all inferences from the facts must be made in favor of the nonmoving party.  Matsushita Elec. Co., 475 U.S. at 587–88.  Both sources of law, then, support taking the Reeds' view of the inference to be drawn from the fact that defendant was chronically understaffed and did not have an employee stationed at the top of the tube run at the time of I.R.'s accident.

Defendant attempts to eliminate a genuine issue of fact as to the presence of a staging employee by asserting that there was in fact an employee

at the top of the tube hill with a radio.  <u>See</u> Docket No. 34 at p. 6.  In support of this assertion of fact, defendant cites Mr. and Mrs. Reeds' depositions and argues they cannot claim a version of facts more favorable than their own testimony, an old chestnut of South Dakota Law.

Reading the Reeds' depositions, however, leads one to conclude defendant's assertion is, if not outright untrue, certainly misleading.  Both Mr. and Mrs. Reed testified *no one* was at the top of the hill staging the tubers at the time of I.R.'s accident.  Docket No. 27-1 at p. 10 (depo. p. 30); Docket No. 27-5 at p. 7 (depo. p. 25).  Prior to the accident, both the Reeds had observed a young man with a radio they assumed was defendant's employee at the top of the hill during one or two of the Reed party's previous 15-20 tube runs.  However, the young man never provided instruction to the tubers about when to go down the slope—he was not staging the tubers.  Docket No. 27-1 at p. 10 (depo. pp. 39-40).  Thus, the Reeds have sustained their assertion of fact that defendant had no employee stationed at the top of the tube hill to stage tubers at the time of I.R.'s accident.

Defendant's motion is decided with resort to two veins of law.  First, the law applicable to summary judgment.  As the movant, *defendant* has the burden to show that there are no genuine disputes of material fact and that, based upon those undisputed facts, it is entitled to judgment as a matter of law.  All of the absences of crucial fact detailed by the court above cut against defendant as the moving party.  Furthermore, all of the inferences from the facts that *are* present in the record must be drawn in favor of the Reeds.

16

Applying those standards to the issue before the court, the conclusion is inescapable that there are genuine issues of material fact existing which prevent summary judgment in defendant's favor.

The second vein of law which comes into play is the dictate of South Dakota law that, ordinarily, questions of whether a defendant acted with gross negligence are questions of fact for the jury if reasonable minds could differ as to the inferences to draw from the known facts.  Gabriel, 847 N.W.2d at 542. That is the situation here.  The court recommends that defendant's motion for summary judgment on the Reeds' gross negligence claim be denied.

**D.      Are There Material Factual Disputes as to Assumption of the Risk?**

Defendant's final argument in favor of its summary judgment motion is that the Reeds assumed the risk of their daughter's accident as a matter of law, thereby relieving defendant of any liability.  The court addresses the first question apparent by defendant's argument:  whether assumption of the risk is even a defense to a claim of gross negligence.  As legal authority for its position, defendant cites only the Restatement (Second) of Torts 496A, cmt. d (1965), and a dissenting opinion in Barger for Wares v. Cox, 372 N.W.2d 161, 170-71 (S.D. 1985) (Wuest, J., dissenting).  See Defendant's Brief, Docket No. 23 at pp. 29-30.  Neither of these authorities represent binding South Dakota law.

The Reeds in their brief do not address the issue of whether assumption of the risk is a defense to a claim of gross negligence.  They argue only that assumption of the risk is a quintessential issue of fact for the jury.  See Docket No. 30 at pp. 13-14.

17

In the Holzer case discussed previously, the plaintiff signed defendant's release of liability form which defendant called an "assumption of the risk" form.  Holzer, 610 N.W.2d at 790.  The court held in that case that liability releases only serve to protect defendants from claims of ordinary negligence, not from claims of gross negligence.  Id. at 793.  However, the title the defendant chose to give its release form is not dispositive of the question in this case.

The South Dakota Supreme Court has said that when a defendant's actions are merely negligent, the defense of contributory negligence applies. But when the defendant's conduct is willful and wanton, the defense of contributory negligence does not apply.  Carlson v. Johnke, 234 N.W. 25, 27-28 (S.D. 1931), overruled on other grounds Wittstruck v. Lee, 252 N.W. 874, 877 (S.D. 1934) (clarifying that it did not adopt the doctrine of comparative negligence in Johnke).

In a dissenting opinion in another case, Justice Henderson stated that while assumption of the risk was a defense to ordinary negligence, the plaintiff would nonetheless have recourse for willful or wanton acts of a defendant. Johnson v. Rapid City Softball Ass'n., 514 N.W.2d 693, 703 (S.D. 1994) (Henderson, J., dissenting).  See Rantapaa v. Black Hills Chair Lift Co., 633 N.W.2d 196, 204 (S.D. 2001) (assumption of the risk is an affirmative defense to an ordinary negligence claim).

The court has found no South Dakota case directly on point addressing whether the defense of assumption of the risk applies to grossly negligent or

18

willful and wanton conduct.  Defendant cites § 496A, comment d, of the
Restatement (Second) of Torts for the proposition that the defense is available
here.  The section cited stands for the proposition that assumption of the risk
is a defense to both ordinary negligence and to reckless conduct.  The section
does not address gross negligence or willful and wanton conduct.  However, it
is true that the South Dakota Supreme Court has, at times, used the word
"reckless" interchangeably with "gross negligence" and "willful and wanton."

*If* assumption of the risk is a defense to a claim of gross negligence, it is
a subjective standard.  Duda v. Phatty McGees, Inc., 758 N.W.2d 754, 758
(S.D. 2008).  Defendant has the burden to prove that "the particular plaintiff in
fact sees, knows, understands and appreciates" the specific risk that caused
the injury.  Id.  The defendant must prove three elements:  (1) the plaintiff had
actual or constructive knowledge of the risk; (2) the plaintiff appreciated its
character; and (3) the plaintiff voluntarily accepted the risk, with the time,
knowledge, and experience to make an intelligent choice.  Id.  "A person is
deemed to have appreciated the risk if it is the type of risk that no adult of
average intelligence can deny."  Id. (quoting Westover v. East River Elec. Power
Coop., Inc., 488 N.W.2d 892, 901 (S.D. 1992)) (cleaned up).

The Restatement states that a plaintiff who knows generally of a danger
does not necessarily assume the risk if the danger appears to be slight or
negligible.  See Restatement (Second) Torts §496D, cmt. b.  The Restatement
also echoes what South Dakota law establishes:  because the standard for
assumption of the risk is a subjective one based on whether the plaintiff knows

of the existence of the risk as well as understands its magnitude and unreasonable character, the question of assumption of the risk is almost always a question of fact for the jury to decide.  Id.; Ray v. Downes, 576 N.W.2d 896, 900 (S.D. 1998).

Here, the Reeds have established that neither they nor their children had ever been tubing before the day they visited defendant's resort.  See Docket No. 27-1 at p.3 (depo. p. 12).  They anticipated that tubing at defendant's resort would be safe, fun and would build family memories.  See Docket No. 33-1 at p. 103.  Furthermore, there is no evidence produced by defendant showing that the Reeds anticipated, understood, and accepted the risk that defendant would provide no employee at the top of the tube run to stage the tubers—contrary to defendant's own policy and its prominent signage at the resort (i.e. follow attendant's instructions when going down the tube run).

The defense of assumption of the risk is a subjective one.  There are material issues of fact as to what the Reeds knew and appreciated in terms of the risk they and I.R. would encounter when tubing at defendant's resort.  Assuming that the defense applies at all to a claim of gross negligence, the court concludes summary judgment is inappropriate on this record.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends granting in part and denying in part defendant's motion for summary judgment, Docket No. 21.  Specifically, the court recommends defendant's motion should be granted as to plaintiff's claim for

ordinary negligence, but recommends defendant's motion should be denied as to plaintiff's claim for gross negligence.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED November 15, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge